UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re FOOD MANAGEMENT GROUP, LLC, et al.

RICHARD PU,

                              Appellant,

        -v-

JANICE B. GRUBIN, as CHAPTER 11 TRUSTEE,
                              Appellee.

Case No. 10-CV-4815 (KMK)

<u>OPINION AND ORDER</u>

<u>Appearances:</u>

Richard Pu
Richard Pu, PC.
New York, New York
*Pro Se Appellant*

Janice Beth Grubin
Todtman, Nachamie, Spizz & Johns, P.C.,
New York, New York
*Counsel for Appellee*

Warren T. Pratt
Drinker Biddle and Reath LLP
Wilmington, Delaware
*Counsel for Appellee*

KENNETH M. KARAS, District Judge:

    In the instant notice of appeal ("the Notice"), Appellant challenges an order of the

bankruptcy court, which reduced his asserted secured claim for $489,448.81 against the debtors'

joint estate to an unsecured claim for $84,454.77. The Court is impressed by Appellant's

gumption, but not by his arguments and, for the reasons stated herein, affirms the order of the

bankruptcy court.

I. Background

The bankruptcy court provided a detailed summary of the factual and procedural history of this dispute in the challenged order below. *See Food Mgmt. Grp. v. Pu* (*In re Food Mgmt. Grp., LLC*), Nos. 04-22880, 04-22890, 04-22891, 04-22892, 04-20312, 06-08470A, 2008 WL 2788738 (Bankr. S.D.N.Y. July 16, 2008). As will be discussed at greater length, this Court must accept the bankruptcy court's factual findings, unless they are clearly erroneous. The Court will therefore presume familiarity with the underlying circumstances and provide merely a cursory review of the facts relevant for deciding this appeal.

Over the course of several years, Anastasio Gianopoulos ("Tom") and Constantine Gianopoulos ("Gus") owned multiple companies in the Westchester area. *See id.* at *1. Among Tom's and Gus's many companies were several shops and at least one bakery that were used to sell donuts pursuant to franchise agreements with Dunkin' Donuts and its corporate partners ("Dunkin' Donuts").[1] *See id.* Following an unrelated dispute, Dunkin' Donuts, Tom, Gus, and Tom's and Gus's companies entered into a settlement agreement in 2002, according to which the Dunkin' Donuts franchise agreements held by Tom's and Gus' companies were to be transferred to new corporate entities—KMA I, II, III, and the Bronx Donut Bakery, all but one of the debtors herein—to be owned and controlled by Tom and or Gus. *See id.* Apparently, however,

---

[1] The Parties and the bankruptcy court occasionally refer to certain companies as "the Gus companies." So far as the Court can tell, this label is used to describe two sets of companies: Tom's and Gus's companies that sold donuts pursuant to franchise agreements with Dunkin' Donuts and Tom's and Gus's companies that were directly involved in the sale of these donuts—for example, their bakery. The Parties and the bankruptcy court also occasionally refer to certain companies as "the Tom companies." So far as the Court can tell, this label is used to describe the debtors in this case, possibly excluding Food Management Group ("FMG"). The Court does not employ these labels herein.

only some Dunkin' Donuts franchise agreements were transferred to the new entities, and Tom's and Gus's various companies retained assets, including several Dunkin' Donuts franchises.

In 2003, Questech Financial ("Questech") brought actions in New York state court against Tom, Gus, several other individuals, and several of Tom's and Gus's companies, seeking to foreclose "upon substantially all of the assets of those companies based on a default under seventeen notes and security agreements that encumbered" those assets. *Id.* Appellant, an attorney, represented the defendants in that action ("the state Questech litigation"). Through Appellant, the defendants represented to Questech that they no longer possessed the collateral, and Tom separately represented that he had "found" the "abandoned" collateral and was using it to operate donut shops. *See id.* Appellant subsequently informed Questech that Tom operated the shops through a company called Food Management Group. *See id.*

Questech then brought suit against FMG in federal district court ("the federal Questech litigation"). In that proceeding, Appellant and Tom again claimed that Tom had found the abandoned assets, and that FMG held the franchise agreements from Dunkin' Donuts. *See id.* at *2. "This assertion was patently false. . . . [I]t was the KMA entities and the Bronx Donut Bakery that held the franchise agreements and other collateral and were operating the donut shops using the" encumbered collateral that Questech sought to recover. *Id.* Magistrate Judge Mark D. Fox, who was overseeing the federal Questech litigation, sanctioned Tom and Appellant for affirmatively misleading Questech and the court in a bad-faith attempt to delay Questech's recovery. The district judge in the federal Questech litigation was the Honorable Colleen M. McMahon. She affirmed Magistrate Judge Fox's finding of Appellant's misconduct but vacated and remanded the amount of sanctions. *See id.* at *12 n.18. In a subsequent disciplinary hearing in federal court, Appellant entered into a stipulation with the Grievance Committee of this

district, in which stipulation he admitted to violating the Disciplinary Rules. *See id.* at *12. "Pursuant to the stipulation [Appellant] was suspended from the practice of law in the Southern District of New York for a period of six months. [He] was also suspended from the practice of law in the New York State courts for one year as a result of his misconduct." *Id.* at 12.

To prevent further abuse and manipulation, Judge McMahon appointed a receiver over the encumbered collateral. *See id.* at *2. Almost immediately thereafter, on June 1 and 2, 2004, the KMA companies and FMG filed voluntary petitions for Chapter 11 bankruptcy. *See id.* Judge Hardin, to whom the bankruptcy case was originally assigned, ordered the bankruptcy petitions "procedurally consolidated for the purposes of joint administration." *Id.* In bankruptcy, the debtors initially sought to settle the controversy with Questech, but during the negotiations it became clear that the subset of Tom's and Gus's companies that had possessed Dunkin' Donuts franchise agreements had not transferred all of their assets and liabilities to the KMA companies. *See id.* To facilitate settlement, Questech and that subset of companies "entered into a stipulation whereby all of the latter's assets and liabilities . . . were transferred to the debtors' estate." *Id.* at *3. An examiner was appointed in 2004, and Appellee, the bankruptcy trustee, was appointed in 2005, "following revelations of a continuing series of misconduct by Tom as owner and principal of the debtors." *Id.* at *2.

Appellant filed a proof of claim with each of the debtors' estates, seeking to recover $489,448.81 in legal fees. *See id.* at *1. He subsequently filed an amended proof of claim, asserting that the majority of his claim was secured pursuant to an agreement he had entered into with FMG through Tom and Gus. *See id.* at *3. In her capacity as trustee, Appellee filed a separate adversarial proceeding against Appellant to recover what she believed to be fraudulent transfers and/or impermissible preferences. *See id.* at *1. She later filed objections to

Appellant's proof of claim in the bankruptcy case proper, denying his claim entirely and asserting that his claim, to the extent it was allowable, was only unsecured. *See id.* at *1 n.1, *3. The bankruptcy court consolidated Appellee's attacks on Appellant's claim into a single adversarial proceeding, received multiple rounds of briefing, and heard arguments on the various issues. *See id.* at *1 n.1.[2] By an order dated July 16, 2008, the bankruptcy court "reduced" Appellant's claim to an unsecured claim for $84,454.77. *See id.* at *18.

Appellant filed a motion for reargument in the main bankruptcy case, challenging Judge Hardin's order. *See Pu v. Grubin (In re Food Mgmt. Grp., LLC)*, 428 B.R. 576, 577 (S.D.N.Y. 2009). Appellant simultaneously sought review of Judge Hardin's order before this Court by filing his first notice of appeal. *See id.* This Court held that it lacked jurisdiction, pending the resolution of Appellant's motion for reargument. *See id.* Judge Robert D. Drain, who assumed responsibility for the case, denied the reconsideration motion, and Appellant filed the instant Notice, seeking this Court's review of Judge Hardin's order.

## II. Discussion

### A. Jurisdiction

Appellee initially argued in her brief that the Court lacked appellate jurisdiction. At oral argument, Appellee walked this argument back—for good reason.

As noted, the bankruptcy case encompassed multiple companies' consolidated bankruptcy petitions. *See In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *2. Consequently, any document filed in the bankruptcy case was filed under multiple dockets: 04-

---

[2] It appears that Appellant did not object to the bankruptcy court's procedural move.

22880, 04-22890, 04-22891, 04-22892, and 04-20312, and 06-08470A. *See id.* at *1. Appellant "filed an identical proof of claim[, and an amended proof of claim,] in each of the debtors' respective cases" for the same amount. *Id.* at *3. Appellee responded, first, by filing an adversarial proceeding against Appellant, which proceeding was docketed separately under number 06-8470A, *see id.* at *1, and then by filing claim objections within the main bankruptcy case, *see id.* at *1 n.1, *3. The bankruptcy court then consolidated Appellee's claim objections and adversarial proceeding into a single adversarial proceeding. Appellant seeks review of the bankruptcy court's holding in the adversarial proceeding. It was there that Judge Hardin granted in part and denied in part Appellee's objection to Appellant's proof of claim and ruled that Appellant's claim was limited to an unsecured claim. *See id.* at *18.

The caption for Appellant's Notice of Appeal lists all of the dockets for the main bankruptcy case, not the docket for the adversarial proceeding. (Dkt. No. 1 (10-4815 Dkt.).) In the Notice, Appellant informed the Court that he was appealing from "the order of the above-captioned court, per the Hon. Adlai Hardin . . . grant[ing] in part [Appellee's] objection to [Appellant's] claim." (*Id.*) Appellee initially argued that Appellant's appeal from the main bankruptcy case did not establish the Court's jurisdiction to review the challenged order from the adversarial proceeding. Her argument was based on two propositions. First, "[i]t is an elementary principle that a notice of appeal . . . must specify a particular order or judgment and must be filed within the four corners of the case in which that order or judgment was entered." *Gray v. Evercore Restructuring, L.L.C.* (*In re High Voltage Eng'g Corp.*), 544 F.3d 315, 318 (1st Cir. 2008). Second, courts traditionally treat adversarial proceedings as separate litigation units for jurisdictional purposes. *See, e.g.*, *In re Teknek, LLC*, 512 F.3d 342, 345 (7th Cir. 2007) ("Adversary proceedings . . . are conceptually distinct from core matters such as locating the

debtor's existing assets and approving plans for reorganization. . . . For the purpose of appellate jurisdiction we treat adversary proceedings as if they were separate suits.").  Based on these two propositions, Appellee argued that the Notice failed to establish appellate jurisdiction.

At oral argument, however, Appellee gave ground on the jurisdictional point.  Appellee appears to have recognized that a court may construe a notice of appeal liberally.  Thus, where a notice refers to one order but not to another, a court

> may exercise appellate jurisdiction over [the] order not specified . . . where there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues.  In determining whether a notice encompasses an unspecified order, [courts] follow a policy of liberal construction of notices of appeal . . . where the intent to appeal an unmentioned or mislabeled ruling is apparent and there is no prejudice to the adverse party.

*Burtch v. Ganz* (*In re Mushroom Transp. Co., Inc.*), 382 F.3d 325, 334 (3d Cir. 2004) (final alteration in original) (citations and internal quotation marks omitted); *see also Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 256 (2d Cir. 1995) ("[W]e construe notices of appeal liberally, taking the parties' intentions into account.").

Here, Appellant's intent was manifestly clear:  He sought review of Judge Hardin's order in the adversarial proceeding between Appellant and Appellee.  Appellee had a full opportunity to brief the issues.  Moreover, given the bankruptcy court's decision to address Appellee's claim objection from the main bankruptcy case in the posture of an adversarial proceeding, *see In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *1 n.1, and given the fact that during the period in which Appellant's motion for reargument was pending, the docket for the adversarial proceeding was terminated, (06-08470A Bankr. Dkt), it is understandable that Appellant did not know whether to include the docket for that proceeding in the caption of the Notice.  (Appellant's Reply Br. at 5.)  Therefore, the Court's exercise of jurisdiction over the Notice is appropriate.

B. Standard of Review

A district court "acts as the first level of appellate review for orders from the bankruptcy court. On appeal, the court may 'affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings.'" *Lear Corp. v. Lacava* (*In re Lear Corp.*), No. 12-CV-2626, 2012 WL 5438929, at *1 (S.D.N.Y. Nov. 5, 2012) (citation omitted). A district court reviews a bankruptcy court's legal rulings de novo. *Id.* "When reviewing a bankruptcy court's findings of fact, [however,] a district court reviews for clear error only and accepts its factual findings unless they are clearly erroneous." *Economic Dev. Growth Ent. Corp. v. McDermott*, 478 B.R. 123, 127 (N.D.N.Y. 2012); *see also COR Route 5 Co. v. The Penn Traffic Co.* (*In re The Penn Traffic Co.*), 524 F.3d 373, 378 (2d Cir. 2008) ("[T]he factual determinations of the Bankruptcy Court in this core proceeding are reviewed for clear error.").

C. Analysis

1. The Secured Status of Appellant's Claim

Appellant argues that the bankruptcy court procedurally and substantively erred in concluding that his claim, to any extent allowed, is unsecured. The Court disagrees and affirms the bankruptcy court's holding that Appellant possesses only an unsecured claim.

a. Appellant's Procedural Arguments

Appellant filed an amended proof of claim against each of the debtors, asserting that he possesses a secured interest against the debtors' joint estate. Under the Bankruptcy Code, a claim is presumed to be allowed absent an objection. *See* 11 U.S.C. § 502(a). And, under the Federal Rules of Bankruptcy Procedure, an objection to a claim must be filed in a specific form, depending on the nature of the objection. For present purposes, only two types of objections are relevant. Claim objections must be filed in a main bankruptcy case, and such objections initiate

so-called "contested matters," *see* Fed. R. Bankr. P. 3007, 9014; *Collier on Bankruptcy* P

3007.01, whereas direct attacks against an asserted interest must be filed as separate "adversarial

proceedings," *see* Fed. R. Bankr. P. 7001(2); *Collier on Bankruptcy* P 7003.01.

Appellant claims that Appellee failed to file a procedurally valid objection to his interest

and, consequently, that the validity of his interest is not properly before the Court.  As noted,

when Appellant filed his proof of claim in each of the bankruptcies, Appellee initially "sought to

expunge the claim under 11 U.S.C. § 502(d) in connection with an adversary proceeding against

[Appellant] to recover certain transfers as fraudulent transfers and/or preferences."  *In re Food

Mgmt. Grp., LLC*, 2008 WL 2788738, at *1 n.1.  Only later did Appellee "file[] . . . objection[s]

to [Appellant's] claim in the main bankruptcy case."  *Id.*  The bankruptcy court then

consolidated "[t]he two actions seeking to disallow and expunge [Appellant's] proof of claim" in

an adversarial proceeding.  *Id.*  And after the bankruptcy court conducted its trial, Appellee

"withdrew her fraudulent transfer and preference claims and accordingly withdrew her claim

under Section 502(d)," but she pursued her claim objections "that [were] originally brought in

the main bankruptcy case."  *Id.*

According to Appellant, neither the initial action to expunge nor the claim objections

provided a procedurally valid basis for the bankruptcy court to hold that Appellant's claim was

unsecured.  The action to expunge was inadequate, says Appellant, because Appellee withdrew

that action following the bankruptcy court's trial.  And the claim objections were inadequate,

because in substance, Appellee was directly attacking the validity of Appellant's asserted

interest, but Appellee improperly filed her attack as a contested matter and not as an adversarial

proceeding.  Appellant is correct, of course, that Appellee's initial adversarial action asserting a

§ 502(d) claim is not a valid basis to hold Appellant's claim unsecured.  Appellee withdrew that

action before the bankruptcy court, and neither the bankruptcy court nor Appellee has suggested

otherwise. Appellant also appears to be correct in asserting that, under the Federal Rules of

Bankruptcy Procedure, Appellee improperly filed a direct attack against Appellant's asserted

security interest in the form of claim objections in the bankruptcy case, rather than in an

adversarial proceeding.

But the Court is unpersuaded that Appellee's procedural path is fatal to her objections.

Indeed, most courts have rejected the formalistic rule that a bankruptcy court may not consider

an improperly filed objection. As one bankruptcy court within the Second Circuit has explained:

> While there is merit to . . . [the] contention that a determination as to the validity,
> priority and extent of a lien is properly brought before a bankruptcy court within
> the context of an adversary proceeding . . . rather than as a contested matter . . .
> where the rights of the affected parties have been adequately presented so that no
> prejudice has arisen, form will not be elevated over substance and the matter will
> be allowed to proceed on the merits as originally filed.

*In re R.F. Cunningham & Co., Inc.*, 355 B.R. 408, 416 n.1 (Bankr. E.D.N.Y. 2006)

(first alteration in original) (internal quotation marks omitted); *see also Trust Corp. of Mt. v.

Patterson* (*In re Copper King Inn, Inc.*), 918 F.2d 1404, 1406–07 (9th Cir. 1990) (finding that a

trustee's failure to file an adversarial proceeding to attack a lien was not fatal because "for all

practical purposes an adversarial proceeding was held in this case," and because the claimant

"ha[d] not shown its position was materially prejudiced by the course of events"); *In re

Gronczewski*, 444 B.R. 526, 529 n.2 (Bankr. E.D. Pa. 2011) (finding any procedural objection

waived where, inter alia, there was "no prejudice to the Respondents in having this dispute

litigated as a contested matter rather than as an adversary proceeding"); *In re Metiom, Inc.*, 301

B.R. 634, 639–40 (Bankr. S.D.N.Y. 2003) (finding that no prejudice would result from

construing a claim objection as a complaint in an adversarial proceeding and following

procedural requirements for adversarial proceedings); *In re Command Servs. Corp.*, 102 B.R. 905, 908 (Bankr. N.D.N.Y. 1989) (same).

The proposition that a bankruptcy court may evaluate an improperly filed attack also finds support from the Federal Rules of Bankruptcy Procedure. Bankruptcy courts possesses authority to consolidate actions under Federal Rule of Bankruptcy Procedure 7042, which adopts Federal Rule of Civil Procedure 42 for adversarial proceedings. And, as noted, here the bankruptcy court exercised that authority to consolidate Appellee's claim objections with her § 502(d) action into a single adversarial proceeding, with all of the attendant procedural protections. *See In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *1 n.1. Furthermore, when Appellee filed her claim objections in September 2007, (Dkt. No. 1100 (04-22880 Bankr. Dkt.)), Federal Rule of Bankruptcy Procedure 3007 expressly provided that a claim objection "becomes" an adversarial proceeding when the objection "is joined with a demand for relief" that normally would require an adversarial proceeding. Fed. R. Bankr. P. 3007 (2007). Subsequent amendments to the Federal Rules appear to disallow this kind of automatic conversion. *See* Fed. R. Bankr. P. 3007(b) ("A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."); *id.* advisory committee's notes (explaining that 2007 amendments "prohibit[] a party in interest from including in a claim objection a request for relief that requires an adversary proceeding"). But Appellant does not argue that these amendments are retroactive.

In short, based on the consensus of authority and the then-existing bankruptcy rules, the Court concludes that the bankruptcy court was entitled to evaluate Appellee's attack on Appellant's asserted secured interest, unless doing so was prejudicial to Appellant.

Appellant presents only one argument as to prejudice. Under the Bankruptcy Code, the trustee of a bankruptcy estate has one year, running from his or her appointment, to commence certain adversarial proceedings on behalf of the bankruptcy estate. *See* 11 U.S.C. § 546(a) (creating a one-year limitations period for a bankruptcy trustee to initiate an action under 11 U.S.C. §§ 544, 545, 547, 548, or 553). In contrast, a trustee may file claim objections at any time. *See, e.g.*, *Comm. of Unsecured Creditors v. Commodity Credit Corp.* (*In re KF Dairies, Inc.*), 143 B.R. 734, 737 (B.A.P. 9th Cir. 1992) (holding that Bankruptcy Code's limitations period applies "only to adversary proceedings seeking affirmative relief," and not defensive matters such as claim objections); *In re Metiom*, 301 B.R. at 641 (finding that § 546(a) does not apply to claim objections). Appellee was appointed trustee in September 2005. (Dkt. No. 426 (04-22880 Bankr. Dkt.).) She filed her attack on Appellant's secured interest as claim objections in September 2007, (Dkt. No. 1100 (04-22880 Bankr. Dkt.))—outside the window in which she could have filed a stand-alone adversarial proceeding under 11 U.S.C. §§ 544, 545, 547, 548, or 553. Appellant argues that the bankruptcy court functionally converted Appellee's procedurally flawed claim objections into a time-barred adversarial proceeding, thereby permitting Appellee to make an end run around the Bankruptcy Code's statute of limitations.

In the context of this case, Appellant's argument is a nonsequitor. Appellant's claim objections were asserted under 11 U.S.C. § 502(b), (Dkt. No. 1100 (04-22880 Bankr. Dkt.)), which is not subject to the Bankruptcy Code's statute of limitations. *See* 11 U.S.C. § 546(a); *DiCello v. United States* (*In re Ry. Reorganization Estate, Inc.*), 133 B.R. 578, 581–82 (Bankr. D. Del. 1991) (finding that § 546 applies exclusively to strong-arm claims under §§ 544, 545, 547, 548, and 553 and not to claims that a lien is unenforceable as a matter of state law under § 502(b)); *Britton v. Fessler & Bowman, Inc.* (*In re Charles H. Britton*), 66 B.R. 572, 575

(Bankr. E.D. Mich. 1986) ("[B]y its own terms, § 546 applies only to actions brought under §§ 544, 545, 547, 548 and 553. This lawsuit does not arise under any of those sections."). In other words, had Appellee filed a new adversarial proceeding against Appellee under Section 502(b) on September 7, 2007—the day she filed her claim objections—that adversarial proceeding would have been timely. Similarly, had Appellee requested leave to amend her complaint in the preexisting adversarial proceeding on September 7, 2007, the bankruptcy court would have had ample basis to grant that request. *See* Fed. R. Bankr. P. 7015 (adopting Fed. R. Civ. P. 15 for adversarial proceedings); Fed. R. Civ. P. 15(a)(2) (directing courts to allow amendments "when justice so requires"). Accordingly, Appellee did not circumvent the Bankruptcy Code's statute of limitations, and Appellant did not otherwise suffer prejudice.[3]

### b. Appellant's Substantive Arguments

Appellant also argues that, on the merits, the bankruptcy court erred in holding that his claim, to the extent allowed, is unsecured. He asserts that he possesses a secured interest—in the form of a lien at law or an equitable lien—against the debtors' estates. At the outset, the Court notes that Appellant could be deemed to have waived this issue by raising it only in a footnote in his opening brief to this Court, (Appellant's Br. at 14 n.4). *See, e.g.*, *City of Syracuse v. Onondaga Cnty.*, 464 F.3d 297, 308 (2d Cir. 2006) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal. Pursuant to this rule, we

---

[3] Appellant also raises the specter that if the bankruptcy court's decision is affirmed, future bankruptcy trustees will "eviscerate" the Bankruptcy Code's statute of limitations by improperly filing all of their otherwise time-barred actions as claims objections. This concern is specious. First, as noted, the Federal Rules of Bankruptcy Procedure no longer provide for the automatic conversion of claims objections into adversarial proceedings. *See* Fed. R. Bankr. P. 3007(b). Second, courts can deal with any alleged abuse on a case-by-case basis. Here, however, Appellant did not claim any such abuse before the bankruptcy court.

have held that an argument made only in a footnote was inadequately raised for appellate review." (citations and internal quotation marks omitted)).  But Appellant has provided (barely) enough analysis in his opening and reply briefs to merit consideration.

Below, Appellant's claim to a lien at law was based solely on a letter drafted by Appellant himself and sent from Tom and Gus to Donald Wolfson, an attorney ("the Wolfson Letter").  *See In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *3 ("[Appellant] relies entirely on one document to support the assertion that he has a secured claim . . . .").  Appellant has not identified any other document on appeal to substantiate the existence of a lien—whether legal or equitable.  The Court thus limits its analysis to whether the Wolfson Letter created a secured interest that Appellant may assert against the estate.  In relevant part, the letter directs Wolfson to pay "90% of [Appellant's] [asserted] legal bills out of proceeds from [the expected] closings [of some transactions involving companies controlled by Mr. Patel]," and further states that "[b]ecause [Appellant] will be performing services in consideration of this instruction, please regard this instruction as being a power coupled with an interest and as being irrevocable."  *Id.*

According to the bankruptcy court, Appellant's claim to a legal lien based on this letter is "frivolous for a host of separate and independent reasons."  *Id.* at *4.  The Court need not address them all.  It is sufficient to note that even if the Wolfson Letter does grant Appellant a lien at law, an issue which the Court emphatically does not reach, that lien has nothing to attach to, leaving Appellant with an unsecured claim.

The Wolfson Letter limits Appellant's alleged interest to a specific asset—namely, the proceeds of the "expect[ed] clos[ing] . . . on some transactions involving companies controlled by Mr. Patel."  *Id.*  Appellant claims that by "transactions," Tom and Gus meant the planned sale of four donut shops to Mr. Patel's company.  *Id.* at *4 n.7.  The bankruptcy court made the

factual finding, which Appellant does not contest, that the planned sale of these properties to Patel never actually occurred. *See id.* at *4. Instead, Appellee disposed of the properties during the course of her administration of the bankruptcy estate, and Appellant asserts that his security interest reaches the proceeds of Appellee's post-petition sales. *See id.* at *3.

The fact that the planned sale of the companies as described in the Wolfson Letter never actually occurred is fatal to Appellant's claim to a secured interest. The Wolfson Letter does not grant Appellant a broad interest in the four properties or any proceeds from their sale to any entity or person; rather the Wolfson Letter grants Appellant an interest only in the proceeds from specifically contemplated closings with Mr. Patel's companies. Those specific transactions never occurred; hence, there are no proceeds Appellant can reach. *See Gordon Car Truck Rental v. Am. Motors Leasing Corp.* (*In re Gordon Car & Truck Rental Inc.*), 80 B.R. 12, 15 (N.D.N.Y. 1987) ("[I]mproper or imprecise characterization of collateral will defeat a claimed security interest. That is so because of the requirement that parties identify the collateral which is the subject of a security interest with reasonable specificity."). As the bankruptcy court explained, Appellant is left with, at best, "a lien on non-existent future property that never came into existence." *In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *4. This conclusion finds ample support in the law. *See Nat'l Commc'ns Ass'n v. Nat'l Telcomms. Ass'n, Inc.*, No. 93-CV-0926, 1995 WL 236731, at *18 (S.D.N.Y. Apr. 21, 1995) (noting that "a security interest or lien in the proceeds of a pending lawsuit generally does not become choate until a settlement or judgment is obtained because the property to which the lien is attached is not 'in existence' until that time"); *Surdam v. Marine Midland Bank*, 603 N.Y.S.2d 233, 234 (App. Div. 1993) (holding that an attorney could not assert a charging lien where his services "ha[d] not created any proceeds," and hence "there [was] nothing to which [the] lien [could] attach"); *cf. Holsinger v.*

*Hanrahan* (*In re Miel*), Nos. 09-01500, 10-09043A, 2010 WL 2743016, at *3 (Bankr. N.D. Iowa July 9, 2010) (dismissing an adversarial proceeding in which plaintiffs sought to enforce a lien on "real estate sold to Heritage Bank or the proceeds of the sale[,]" because "[t]here [were] no proceeds from the sale to which Plaintiffs' lien [could] attach").

Appellant counters that the fact that no "proceeds" existed when the interest was granted is irrelevant. Appellant is correct that under New York law a debtor may assign future funds, such as rents, and thereby vest a secured interest in the assignee. *See, e.g.*, *In re 354 E. 66th St. Realty, Corp.*, 177 B.R. 776, 782 (Bankr. S.D.N.Y. 1995) ("When a secured creditor has an interest in future rents, it has an interest in the collateral that arises when it is earned."); *In re Northport Marina Assocs.*, 136 B.R. 911, 916 (Bankr. E.D.N.Y. 1992) ("In New York an assignment of rent clause operates merely as a pledge of rent to which the pledgee does not become entitled until it asserts its rights."). Similarly, a debtor may grant a security interest in future tangible property, such as inventory and equipment. *See, e.g.*, *In re Minor*, 443 B.R. 282, 288 n.3 (Bankr. W.D.N.Y. 2011) ("Today, under the Uniform Commercial Code, the proper perfection of a security interest may create an enforceable lien in after-acquired property, without regard to any entitlement to an equitable lien under common law."); *In re Kerner Printing Co.*, 178 B.R. 363, 365 (Bankr. S.D.N.Y. 1995) ("Pursuant to properly perfected financing statements . . . [the creditor] has valid, enforceable and perfected . . . security interests in all of the debtor's existing and after acquired personal property, including, the debtor's equipment, inventory, accounts, chattel paper, contracts and general intangibles."); *AMG Indus., Inc. v. A.J. Eckert Co.*, 719 N.Y.S.2d 192, 193 (App. Div. 2001) (noting that the bank possessed a "duly executed and perfected security interest in plaintiff's current and after-acquired equipment, inventory, accounts receivable, contract rights and general intangibles").

But a creditor that seeks to recover on a lien against future assets can reach only those assets that "fit[] within one of the general categories of collateral described in the security agreement and financing statement." *United States v. Smith*, 832 F.2d 774, 777 (2d Cir. 1987); *see also In re Gordon Car and Truck Rental Inc.*, 80 B.R. at 15 (finding that a bank's security interest in debtor's "accounts receivable" did not reach "post-petition sale proceeds of . . . license agreements"). The proceeds from the Appellee's separate transactions with third parties involving the four properties, during her administration of the bankruptcy estate, does not fit within the category of collateral described in the Wolfson Letter—proceeds from a planned sale of the properties to a specific buyer. Appellant therefore may assert only an unsecured claim against the estate.

Appellant argues that he is alternatively entitled to an equitable lien against the proceeds of Appellee's sale of the four donut shops during her administration of the bankruptcy estate. He claims that the question of who actually purchased the properties is irrelevant; the properties were sold, generating proceeds for the debtors' estate, and his equitable lien should attach to those proceeds. This claim is also meritless. To be entitled to an equitable lien against property, a person must demonstrate, inter alia, the existence of a contract which "identif[ies] the property directly, or describe[s] the property in such a way as to make identification possible." *See Sec. Pac. Mortg. & Real Estate Servs. v. Phillipines*, 962 F.2d 204, 208–09 (2d Cir. 1992). "An equitable lien may be imposed on land, chattels, or a certain fund, but a mere promise, whether parol or written, to satisfy a debt from a 'designated fund' does not support creation of an equitable lien on that fund." *Id.* at 209; *see also Kramer v. Alston* (*In re Alston*), 322 B.R. 265, 268 (Bankr. D.N.J. 2005) ("When one is promised payment for services rendered out of a fund created in whole or in part by the efforts of the promisee, a lien in favor of the promisee will

attach to the fund when it comes into existence." (internal quotation marks omitted)).

Here too, the only documentation Appellant points to is the Wolfson Letter. And Appellant's claim is defeated by the fact that the only property or fund that the Letter *identifies* is the proceeds of a sale that never occurred—i.e., a sale to Mr. Patel. The Wolfson Letter does not grant Appellant an interest in the donut shops themselves or in the proceeds of any sale of the shops to any buyer. *See Sec. Pac. Mortg. & Real Estate Servs.*, 962 F.2d at 209 (explaining that, under New York law, to possess an equitable lien, an individual must, inter alia, have "an interest in *specific property*" (emphasis added)); *In re Gordon Car and Truck Rental Inc.*, 80 B.R. at 15 (noting that "improper or imprecise characterization of collateral will defeat a claimed security interest"). Therefore, even if Appellant otherwise could claim an equitable lien under New York law—also a question which the Court does not reach—there are no proceeds to which that lien can attach.

## 2. Services Rendered to "Affiliates"

Appellant filed a claim against the debtors' estate for almost $500,000 based on legal services that he had provided to the debtors, Tom and Gus, and Tom's and Gus's other companies. Appellant subdivided his claim into the thirteen distinct matters in which he had provided legal services. Appellee objected to the entirety of Appellant's claim. The bankruptcy court conducted an exhaustive inquiry into whether Appellant had a valid claim with respect to each of the thirteen matters. The court sustained all of Appellee's objections to those matters in which "none of the entities represented [by Appellant] were debtors or had assets that were acquired by any of the debtors." *In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *6.[4] In

---

[4] Specifically, the bankruptcy court disallowed Appellant's claim based on his representation of New York Food Group and Food Systems in the "14th Street litigation"; his

18

total, the bankruptcy court disallowed just over $100,000 of Appellant's claim on the basis that Appellant was seeking compensation from the debtors' estate for work that he had performed for unrelated non-debtor entities.  Appellant argues that this was in error, because he was hired by debtor FMG to provide representation and other legal services on behalf of those entities—entities which he refers to as FMG's "affiliates."

Appellant's claim to compensation for his legal work on behalf of the affiliates is slippery—whether by deliberate design or by imprecise drafting.[5]  The bankruptcy court made the factual finding that Tom and Gus have owned multiple companies.  *See id.* at *1 (describing that prior to consolidation, there were "numerous companies owned and controlled by one or both of the Gianopoulos brothers").  A subset of Tom's and Gus's companies owned and operated donut shops pursuant to franchise agreements with Dunkin' Donuts.  *See id.*  In 2002,

_____

claim based on his representation of New York Food Group, Food Systems, Gus, Tom, and Mark Foster in the "PF–NY litigation"; a third of his claim based on his services in the "Dunkin' Donuts litigation[s]"; his claim based on services he provided to Food Systems in the "Food Systems v. Gramercy Arms litigation"; his claim based on the services he performed in the "Liff loan" matter; his claim for "services provided to the shop located on 14th Street in Manhattan"; his claim for a consultation with Tom regarding a potential "Panera Bread franchise opportunity"; his claim for services he provided in reviewing a specific complaint; his claim for services regarding correspondence with Tom regarding a complaint; his claim for services performed in representing Benni's; and his claim for services provided to 580 Ninth Avenue Food Associates, WP Donuts, Gregory Masone, and Gregory Katsoros.  *See In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *11–18.

[5] The Court's uncertainty as to the contours of Appellant's argument derives primarily from his repeated and inconsistent use of the word "affiliates."  In certain instances, Appellant uses "affiliates" to describe only the KMA debtors.  (Appellant's Br. at 3–4 ("Prior to May 2003, the affiliates were a group of approximately twenty-four corporations owned by Gus (the 'Gus Corporations').  After May 2003, the affiliates were the KMA debtors herein.").)  Elsewhere, however, Appellant uses "affiliates" to describe all of the companies owned by Tom and Gus.  (Appellant's Br. at 19–23 (using "affiliates" to describe companies that did not become debtors or transfer assets to the debtors' estate).)  The Court will not chase Appellant down this rabbit hole.  The term "affiliates" has no legal relevance.  The only question is whether Appellant is entitled to compensation for the services that he provided in each of the thirteen matters.

those companies transferred some, but not all, of their franchise agreements with Dunkin'

Donuts to the KMA companies, now debtors, upon the formation of the latter set of companies.

*See id.* ("[S]ome but not all of the franchise agreements held by the Gianopoulos companies

were transferred to [the KMA companies].").  That same subset of Tom's and Gus's companies

later transferred all of their remaining assets and liabilities to the debtors' joint bankruptcy estate

in 2004, pursuant to a so-ordered stipulation between various parties to the bankruptcy case

below.  *See id.* at *3.  But some of Tom's and Gus's companies never owned or operated donut

shops, and these companies did not become the debtor companies and did not transfer their

assets and liabilities to the debtors' joint estate.  *See id.* *1, *3 n.5 (describing that only "some"

of Tom's and Gus's companies "operated the donut shops and bakery that were later transferred

to [the debtors]" and further explaining that some of Gus's and Tom's companies did not transfer

their assets to the bankruptcy estate).  The bankruptcy court referred to these companies as

"unrelated non-debtor entities,"[6] and held, inter alia, that Appellant was not entitled to

compensation for the legal services that he had performed exclusively for them.  *See id.* at *6.

The Court does not understand Appellant to be challenging the bankruptcy court's factual

finding that certain companies owned by Tom and Gus are not debtors and/or have not

transferred their assets and liabilities to the debtors' estate.   Moreover, even if Appellant does

intend to challenge that factual finding, he has not shown that the finding is clearly erroneous.

To reach this finding, the bankruptcy court relied on corporate documents, settlement

---

[6] The bankruptcy court used this label throughout the opinion.  However, the bankruptcy court also described that with respect to certain litigation matters, "[n]one of the entities [Appellant] represented were debtors herein or Gus Companies nor were any assets involved transferred to the debtors."  *See id.* at *11, 15, 17, 18.  This latter refrain is simply another way of stating that the entities Appellant represented were "unrelated non-debtor entities."

agreements in separate litigations, and so-ordered stipulations, *see id.* at *1–3, 6, and Appellant

has provided no new evidence which would call into question the bankruptcy court's finding.

Similarly, the Court does not understand Appellant to be claiming that the bankruptcy court

ultimately mischaracterized any of the various entities as unrelated non-debtor entities. For

example, the bankruptcy court concluded that New York Food Group and Food Systems were

unrelated non-debtor entities. *Id.* at *11. Appellant does not appear to challenge this factual

characterization—let alone to show that the characterization was clearly erroneous.[7]

      Instead, the Court understands Appellant to be arguing that the debtors' estate is

financially on the hook for all of the legal services that Appellant provided to all of the

companies that Tom and Gus owned, including the unrelated non-debtor entities. But even this

argument requires further parsing. According to the bankruptcy court, Appellant based his claim

to compensation for the services he rendered to the unrelated non-debtor entities on a novel legal

theory: that a lawyer can seek compensation from a debtor for "providing services

to . . . unrelated non-debtor entities," if those services had "contributed to their continued

vitality," thereby benefitting the debtor "by protecting its revenue stream, some of which was

allegedly derived from the[] non-debtor entities." *Id.* at *6. The bankruptcy court found this

claim wanting for two reasons. First, the theory has no doctrinal basis and is therefore incorrect

as a matter of law. *See id.* And second, as a factual matter, Appellant has not provided

---

[7] Appellant would face a steep hill in this regard. The bankruptcy court spent several years performing yeoman's work in its effort to characterize the various entities. Indeed, on December 1 and 3, 2004, the bankruptcy court did initially determine that two companies—Food Systems and Argonne—were required to transfer their assets and liabilities to the debtors' estate. (Dkt. Nos. 165, 167 (04-22880 Bankr. Dkt.).) But three years later, the bankruptcy court concluded that its initial order had been in error and consequently ordered that Food Systems' and Argonne's assets and liabilities be separated from the debtors' estate, (Dkt. No. 1096 (04-22880 Bankr. Dkt.)). *See In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *3 n.5.

sufficient evidence to demonstrate "that the unrelated non-debtor entities [Appellant] represented provided any revenue at all to any debtor entity on a net basis." *Id.*

In his brief to this Court, Appellant downplays his what-benefitted-the-unrelated-non-debtor-entities-benefitted-the-debtors theory. (Appellant's Br. at 19, 22 (describing the issue of "whether the affiliates had benefitted from the representation" as a "red herring" and stating "it wasn't relevant whether FMG benefitted from the representation of the affiliates").)[8] Instead, he principally advances a scope-of-employment argument, asserting that his "right to payment arises from a contract between [Appellant] and FMG, pursuant to which FMG agreed to pay for [Appellant's] representation of the affiliates." (*Id.* at 20.) This claim rests on the factual assertion that all of the services that he performed on behalf of Tom, Gus, and their companies—including the unrelated non-debtor entities—was covered by his employment contract, which ran directly to debtor FMG.

The bankruptcy court made an express factual finding to the contrary. As Judge Hardin explained, based on the two "Letters of Engagement" that Appellant submitted to Tom and Gus, "it is clear that [Appellant] was retained by Gus and Tom in their individual capacities *as well as by the various entities whose interests he represented* from time to time." *In re Food Mgmt. Grp., LLC*, 2008 WL 2788738, at *10 (emphasis added); *see also id.* at *9 (explaining that

_____

[8] At oral argument, however, Appellant seemed to revive this position. The Court rejects it. Appellant still has not provided any authority for the proposition that, under New York law, a lawyer may seek compensation from a debtor for services that the lawyer provided to non-debtor entities, on the exclusive basis that those services indirectly benefitted the debtor. Appellant's claim—to the extent it is predicated on this proposition—is "unenforceable against the debtor and property of the debtor." 11 U.S.C. § 502(b)(1); *see also In re J&S Conveyors, Inc.*, 409 B.R. 635, 647 (Bankr. N.D.N.Y. 2009) ("[T]he claimant's right to payment must be enforceable against the debtor under applicable state law when the claim is filed . . . ."); *In re Pruitt*, 401 B.R. 546, 557 (Bankr. D. Conn. 2009) (noting that § 502(b) "affirmatively incorporates State Law for a description of enforceable pre-existing obligations").

Appellant's Letters of Engagement refer to "Gus and Tom in their individual capacities, as well as in their capacities as the principals of their various companies "). The Court has reviewed both Letters of Engagement and finds nothing to suggest that the bankruptcy court's conclusion is incorrect. (Dkt. No. 4 (06-8470A Bankr. Dkt.).) Appellant therefore bears a heavy burden in showing that the bankruptcy court's finding is clearly erroneous.

Appellant has not met that burden. As noted, Appellant's argument before this Court is distinct—or at least, repackaged—from the argument that he presented to Judge Hardin. Here, Appellant focuses on four sources of evidence which, he purports, demonstrate that his work for the unrelated non-debtor entities was within the scope of his work for FMG. (Appellant's Br. at 20–22; Appellant's Reply Br. at 17–18.) But Judge Hardin found that Tom and Gus regularly engaged in deceptive practices and "indiscriminately shuttled money between their various corporate entities without regard for corporate separateness," *In re Food Mgmt. Grp., LLC*, 2008 WL 2788738 at *6, and Appellant has not shown these findings to be clearly erroneous. There are therefore adequate grounds, based on the record below, to reject or discredit any new source of evidence that describes or documents the financial practices of Tom, Gus, and their companies and that was not verified by external monitors. The Court now considers each source of evidence in turn.

First, Appellant states that the bankruptcy court admitted that he was employed by FMG. This assertion is simply disingenuous. As noted, the bankruptcy court found that he was employed by FMG, but also by the other debtor companies, Tom and Gus individually, and the various other companies that Tom and Gus owned. Second, Appellant argues that FMG regarded Appellant's fees as FMG's exclusive obligation, as demonstrated by an August 13, 2004 verified operating statement for FMG's bankruptcy estate. That statement indeed lists

23

Appellant's thirteen matters as FMG liabilities. (Dkt. No. 97 (04-22880 Bankr. Dkt.).) But the Court is unwilling to attach much weight, if any, to this evidence. The signatory to the August 13 operating statement is Tom Gianopoulos, (*id.*), who previously had been sanctioned by a court for making deceptive and fraudulent statements, in bad faith, regarding the financing and operations of the various companies that he owned. *In re Food Mgmt. Grp., LLC*, 2008 WL 2788738 at *2. Moreover, the operating statement was entered only a few weeks after the bankruptcy court ordered the appointment of an examiner to oversee the bankruptcy estate, (Dkt. No. 77 (04-22880 Bankr. Dkt.), and several weeks before the court ordered the appointment of a trustee to prevent further fraud and financial wrongdoing by Tom and Gus, (Dkt. Nos. 409, 425, 426 (04-22880 Bankr. Dkt.)). Third, Appellant states that prior to the bankruptcy petitions, he received all of his payments from FMG in the form of checks drawn from FMG's account. (Appellant's Br. at 19, 21.; Appellant's Br., app. at 495.) But the Court is unwilling to attach much weight, if any, to this fact, given the documented financial deceptions practiced by Tom and Gus. *See In re Food Mgmt. Grp., LLC*, 2008 WL 2788738 at *6. And fourth, Appellant submits a fax he sent to "Petula"—presumably an FMG employee—that addresses non–FMG litigation matters. (Appellant's Br., app. at 40.) This single communication, without more, is simply too thin a reed for Appellant to claim that all of his work for Tom, Gus, and their companies ran exclusively through debtor FMG. Although Appellant sent the fax to "Petula" at FMG, it is not at all clear that Appellant sent it to Petula in his official capacity as an FMG employee or officer. Furthermore, unlike the Letters of Engagement, this letter does not discuss the terms of Appellant's engagement; it merely flags "four housekeeping matters" to be resolved. (*Id.*)

<u>3. Services Rendered in the Federal and State Questech Litigations</u>

The bankruptcy court disallowed Appellant's claim for compensation for the legal services he performed in the federal Questech litigation. The bankruptcy court held that Appellant forfeited any right to fees for his services in that litigation for two independent reasons: first, because he violated the Disciplinary Rules—which misconduct led to his being sanctioned and temporarily disbarred—and second, because he was discharged by FMG for cause.

As to the first reason, Appellant responds that under New York law, an attorney who violates the disciplinary rules is subject to only partial, rather than total, forfeiture of his or her fees. Specifically, he claims that under the "faithless servant doctrine," the bankruptcy court should have disallowed only $52,000 of his $180,000 claim for his federal Questech litigation services. (Appellant's Br. at 24.) But the Court need not address this contention, because the bankruptcy court's second reason is unassailable.

The bankruptcy court made the express factual finding that "Appellant was fired by FMG for cause." *In re Food Mgmt. Grp., LLC*, 2008 WL 2788738 at *13. The Court must accept this finding unless it is clearly erroneous. And as support for this finding, the bankruptcy court cited an order by Judge McMahon in the federal Questech litigation, in which she declared that, after the court had appointed a receiver to oversee companies owned by Tom and Gus, stayed the civil trial, ordered a hearing on whether Tom and Appellant had perpetrated a fraud on the court, and referred testimonial matters to the United States Attorney's office, "FMG fired [Appellant], retained new counsel, and put itself into bankruptcy." (Dkt. No. 122 (04-CV-1151 Dkt.).)[9]

---

[9] Judge McMahon's order states that Appellant was "fired"; it does not use the magical words "for cause." But to the extent that the bankruptcy court inferred, or reached an

Appellant makes only two assertions to show that the bankruptcy court's factual finding was clearly erroneous. First, he asserts that "Judge McMahon heard no evidence" on this question, because "she wasn't the trier of fact" on the issue of sanctions—Magistrate Judge Fox was. (Appellant's Br. at 30.) But the basis for Judge McMahon's determination that Appellant was fired is not at issue here.[10] Judge McMahon made the unqualified statement that FMG fired Appellant, and the bankruptcy court adopted that finding. Second, Appellant argues that FMG could not have fired Appellant for cause, because "[Appellant's] firm Sichenzia Ross made a motion to withdraw as counsel." (*Id.*) It is the case that the law firm Sichenzia Ross filed a motion to withdraw as FMG's counsel on May 28, 2004. (Dkt. Nos. 66, 67 (04-CV-1151 Dkt.).) But Appellant has not provided any evidence that he voluntarily withdrew as FMG's counsel. Indeed, Sichenzia Ross's signatory on the joint motion to withdraw is Mark Ross, not Appellant. Furthermore, Mr. Ross provided no explanation for why Sichenzia Ross was withdrawing. Without any additional information, the Court is inclined to conclude that the law firm filed the motion to withdraw, precisely because FMG had fired Appellant. Even if that is not the case,

---

independent legal judgment, that Appellant was fired for cause, the Court affirms that conclusion. New York courts have deemed discharge to be "for cause" where an attorney engaged in misconduct or even merely "improper" behavior. *See, e.g.*, *Allstate Ins. Co. v. Nandi*, 258 F. Supp. 2d 309, 312 (S.D.N.Y. 2003) ("Courts typically find a discharge 'for cause' where there has been a significant breach of legal duty."); *Cruz v. Olympia Trails Bus Co.*, No. 99-CV-10861, 2002 WL 1835440, at *4 (S.D.N.Y. Aug. 8, 2002) (finding that a law firm was terminated "for cause" where the attorneys' "repeated failure to return . . . telephone calls was improper").

[10] The Court is not holding that Appellant was or is collaterally estopped from arguing that he was not fired. As Appellant points out, it is not clear that Judge McMahon's finding is entitled to preclusive effect, since the question of whether Appellant was fired may not have ever been fully litigated. But because the bankruptcy court adopted the factual finding that Appellant was fired, the burden is on Appellant to prove that the finding was clearly erroneous. He cannot meet that burden merely by asserting that the issue was never fully litigated.

however, the motion certainly does not demonstrate that the bankruptcy court's finding was clearly erroneous.

Because Appellant was fired for cause from the federal Questech litigation, he is not entitled to recover any fees for work he performed on that litigation. *See Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004) ("If a lawyer is discharged for cause, he or she is not entitled to legal fees." (citing *Teichner ex rel. Teichner v. W&J Holsteins, Inc.*, 478 N.E.2d 177, 178–79 (N.Y. 1985)); *Farb v. Baldwin Union Free Sch. Dist.*, No. 05-CV-0596, 2011 WL 4465051, at *9 (E.D.N.Y. Sept. 26, 2011) ("Under New York law, an attorney may be dismissed by a client at any time with or without cause. If an attorney is discharged for cause, the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement." (citations and internal quotation marks omitted)); *Nandi*, 258 F. Supp. 2d at 312 (same); *Cruz*, 2002 WL 1835440, at *4 (S.D.N.Y. Aug. 8, 2002) (same). Furthermore, it would defy common sense to allow attorneys, such as Appellant, who have been discharged *for cause* to recover a portion of their fees, since proportionate recovery is exactly what attorneys who have been discharged *without cause* are entitled to seek. *See, e.g.*, *Lai Ling Cheng v. Modansky Leasing Co.* 539 N.E.2d 570, 572 (N.Y. 1989) ("When a client discharges an attorney without cause, the attorney is entitled to recover compensation from the client measured by the fair and reasonable value of the services rendered whether that be more or less than the amount provided in the contract or retainer agreement." (citation omitted)); *Byrne v. Leblond*, 811 N.Y.S.2d 681, 683 (App. Div. 2006) ("As against the client, where the discharge is without cause the outgoing attorney is limited to recovering in quantum meruit the reasonable value of the services rendered." (citations omitted)).

## III. Conclusion

For the reasons stated herein, the judgment of the bankruptcy court is hereby affirmed. Appellant's claim is allowed as an unsecured claim in the amount of $84,454.77. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated:      December, **19**, 2012
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List:

Richard Pu
Richard Pu, P.C.
120 E. 90th St., 10c
New York, NY 10128
(212)-427-3665
richard@newyorklitigator.com
*Counsel for Appellant*

Janice Beth Grubin
Todtman, Nachamie, Spizz & Johns, P.C.,
425 Park Avenue
New York, NY 10022
(212) 754-9400
jgrubin@tnsj-law.com
*Counsel for Appellee*

Warren T. Pratt
Drinker Biddle and Reath LLP(DE)
1100 N. Market Street, Suite 1000
Wilmington, DE 19801
(302)-467-4224
warren.pratt@dbr.com
*Counsel for Appellee*